**AFFIDAVIT**

I, Garrett Greer, being duly sworn, declare and state as follows:

## I.      INTRODUCTION

1.      I am a Special Agent ("SA") employed by the Office of Export Enforcement ("OEE"), Bureau of Industry and Security ("BIS"), of the United States Department of Commerce.  I have been employed as a Special Agent with the United States Department of Commerce since July 2019, and before that was a Special Agent with the Department of Homeland Security beginning in December 2008 until May 2018.  From May 2018 until July 2019 I was employed by the Department of Homeland Security as an Intelligence Research Specialist.  Prior to that, I was a Police Officer with the Town of Groveland in the Commonwealth of Massachusetts from February 2007 until December 2008.  I received my Bachelor's Degree in Sociology from Boston College and my Master's Degree in Criminal Justice Administration from Salem State University. I am authorized to make arrests for violations of federal law and I am familiar with the means by which individuals and businesses use complex procurement networks to circumvent US export law.

## II.     PURPOSE OF AFFIDAVIT

2.      This affidavit is made in support of an application for a warrant authorizing the installation, use, monitoring, and maintenance of a Global Positioning System ("GPS") mobile tracking device in or on a shipment of simulated goods, defined as one (1) GPOTAC – 1 – 8x24i – GPORT 820 – Horseshoe Reticle and one (1) MEOSTAR R2 – 2.5-15x56 RD – 4C Illuminated Reticle – MEO597490 (the "Target Shipment") shipped from New England Custom Gun, Claremont, New Hampshire to Restu Sunarto, 3340 A Greens Road Suite 700, Room 2269, Houston, Texas 77032.

3.      Based on the facts set forth below and in the attached exhibit, there is probable cause to believe that the movement of the Target Shipment constitutes evidence of violations of Pub. L. No. 115-232, tit. 17, subtitle B, 132 Stat. 2208 (2018) (the Export Control Reform Act of 2018); 15 C.F.R. §§ 730-774 (the Export Administration Regulations); 13 U.S.C. § 305 (Unlawful Export Information Activities); and 18 U.S.C. § 554 (Smuggling Goods from the United States) (collectively, the "Subject Offenses").

4.      Based upon a License Determination by the Department of Commerce, the Bureau of Industry and Security has determined that the MEOPTA MEOSTAR R2 2.5-15x56 RD riflescope, part number MEO597940 and GPOTAC 1-8x24i riflescope with Horseshoe Reticle, part number GPORT820, are classified under ECCN 0A987.a.  Items classified under ECCN 0A987.a are controlled on the Commerce Control List (15 C.F.R. Part 774, Supplement No. 1) for Firearms Convention (FC1) reasons to Canada.

5.      The MEOPTA MEOSTAR R2 2.5-15x56 RD has a capped turret system commonly found on hunting scopes. Its reticle is simplistic in design and used mostly for hunting applications.

6.      The GPO-TAC 1-8x24i with Horseshoe Reticle features a locking turret system in 0.1 Mil-Rad clicks which allows the operator to make quick reticle adjustments based on range or wind velocity. The Horseshoe Reticle itself was originally designed for fast target acquisition with ranging and windage hash marks. The reticle was designed with tactical applications in mind. (The original "Horseshoe" design in the center of the reticle was designed to bracket a man's head.) However, this scope is also used by "3-Gun" participants in shooting competitions.

7.      Specifically, there is probable cause to believe that the Target Shipment's ultimate destination will be Canada due to the Canadian phone number that was provided by Restu

Sunarto (514-933-5120) on both orders that he placed through New England Custom Gun. Additionally, the IP address that was provided by New England Custom Gun from both orders shows that the IP address hits from locations in the United States and Canada.

8. The Target Shipment that would be sent to Restu Sunarto at 3340 A Greens Road Suite 700, Room 2269, Houston, Texas 77032, will not contain the scopes that he ordered in the aforementioned paragraphs. The package would instead contain the GPS tracking device and possibly various weight bearing items to ensure that the weight of the package would be close to the weight of the goods ordered by Restu Sunarto.

9. Additionally, New England Custom Gun has been fully cooperating with authorities throughout this process and has agreed to cooperate in sending this GPS Tracking device in one of their mailing packages. The OEE Boston Field Office will be paying for all shipping costs to the target address in Houston, Texas. If authorized, the installation of the tracking device will occur at New England Custom Gun located in Claremont, New Hampshire, by OEE Agents the day in which the item is to be shipped.

10. Further, as explained below and in the attached exhibit, there is probable cause to believe that the use of a GPS tracking device on the Target Shipment would provide evidence of these crimes, including, but not limited to, information tending to identify individuals and locations the Target Shipment visits and the means by which the crimes are being committed.

11. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of the investigation into

this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only and all dates are approximate.

### III.  SUMMARY OF APPLICABLE EXPORT CONTROL LAWS

**A.  THE EXPORT CONTROL REFORM ACT AND THE EXPORT ADMINISTRATION REGULATIONS**

12. On August 13 2018, the President signed into law the National Defense Authorization Act of 2019, which includes the above-referenced Export Control Reform Act of 2018 ("ECRA"). In part, ECRA provides permanent statutory authority for the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774, which most recently had been operative under the International Emergency Economic Powers Act, 50 U.S.C. § 1701-1706 ("IEEPA"). Accordingly, ECRA is the controlling statute (as the authority to promulgate export control regulations) for conduct occurring after August 13, 2018.

13. ECRA provides that "the national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items, and specified activities of United States persons, wherever located, be controlled." ECRA § 1752. To that end, and like IEEPA before it, ECRA grants the President the authority to "(1) control the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or foreign persons; and (2) the activities of United States persons, wherever located, relating to" specific categories of items and information. ECRA § 1753. ECRA grants to the Secretary of Commerce the authority to establish the applicable regulatory framework.

14. Pursuant to that authority, the Department of Commerce reviews and controls the export of certain items, including goods, software, and technologies, from the United States to foreign countries through the EAR. In particular, the EAR restrict the export of items that could

4

contribute to the military potential of other nations or that could be detrimental to United States foreign policy or national security. The EAR impose licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or lawfully re-exported from one foreign destination to another.

15. The most sensitive items subject to EAR controls are identified on the Commerce Control List, 15 C.F.R. § 774, Supp. No. 1, and are categorized by Export Classification Control Numbers, each of which has export control requirements depending on the destination, end use, and end user.

16. Under ECRA, it is unlawful for any person to violate, attempt to violate, conspire to violate, or cause a violation of its provision or any regulation, order, license, or other authorization issued under ECRA. ECRA § 1760. A person who willfully commits or willfully aids and abets these offenses is guilty of a federal crime punishable by up to a $1,000,000 fine and 20 years' imprisonment. ECRA § 1760(b).

17. Specifically, ECRA provides:

(2) SPECIFIED UNLAWFUL ACTS.—The unlawful acts described in this paragraph are the following:

> (A) No person may engage in any conduct prohibited by or contrary to, or refrain from engaging in any conduct required by this title, the Export Administration Regulations, or any order, license or authorization issued thereunder.
>
> (B) No person may cause or aid, abet, counsel, command, induce, procure, or approve the doing of any act prohibited, or the omission of any act required by this title, the Export Administration Regulations, or any order, license or authorization issued thereunder.
>
> (C) No person may solicit or attempt a violation of this Act, the Export Administration Regulations, or any order, license or authorization issued thereunder.

(D) No person may conspire or act in concert with one or more other persons in any manner or for any purpose to bring about or to do any act that constitutes a violation of this title, the Export Administration Regulations, or any order, license or authorization issued thereunder.

(E) No person may order, buy, remove, conceal, store, use, sell, loan, dispose of, transfer, transport, finance, forward, or otherwise service, in whole or in part, any item exported or to be exported from the United States, or that is otherwise subject to the Export Administration Regulations, with knowledge that a violation of this title, the Export Administration Regulations, or any order, license or authorization issued thereunder, has occurred, is about to occur, or is intended to occur in connection with the item unless valid authorization is obtained therefor.

(F) No person may make any false or misleading representation, statement, or certification, or falsify or conceal any material fact, either directly to the Department of Commerce, or an official of any other United States agency, or indirectly through any other person—

(i) in the course of an investigation or other action subject to the Export Administration Regulations;

(ii) in connection with the preparation, submission, issuance, use, or maintenance of any export control document or any report filed or required to be filed pursuant to the Export Administration Regulations; or

(iii) for the purpose of or in connection with effecting any export, reexport, or transfer of an item subject to the Export Administration Regulations or a service or other activity of a United States person described in section 104.

(G) No person may engage in any transaction or take any other action with intent to evade the provisions of this title, the Export Administration Regulations, or any order, license, or authorization issued thereunder.

(H) No person may fail or refuse to comply with any reporting or recordkeeping requirements of the Export Administration Regulations or of any order, license, or authorization issued thereunder.

(I) Except as specifically authorized in the Export Administration Regulations or in writing by the Department of Commerce, no person may alter any license,

authorization, export control document, or order issued under the Export Administration Regulations.

(J) No person may take any action that is prohibited by a denial order issued by the Department of Commerce to prevent imminent violations of this title, the Export Administration Regulations, or any order, license or authorization issued thereunder.

(3) ADDITIONAL REQUIREMENTS.—For purposes of subparagraph (G), any representation, statement, or certification made by any person shall be deemed to be continuing in effect. Each person who has made a representation, statement, or certification to the Department of Commerce relating to any order, license, or other authorization issued under this title shall notify the Department of Commerce, in writing, of any change of any material fact or intention from that previously represented, stated, or certified, immediately upon receipt of any information that would lead a reasonably prudent person to know that a change of material fact or intention had occurred or may occur in the future.

ECRA § 1760(a)(2)-(3) (codified at 50 U.S.C. § 4819).

**B.     UNLAWFUL EXPORT INFORMATION ACTIVITIES**

18.     Title 13, United States Code, Section 305 (Penalties for Unlawful Export Information Activities), provides:

Any person who knowingly fails to file or knowingly submits false or misleading export information through the Shippers Export Declaration ("SED") (or any successor document) or the Automated Export System ("AES") shall be subject to a fine not to exceed $10,000 per violation or imprisonment for not more than 5 years, or both.

13 U.S.C. § 305.

19.     The Department of Commerce, through the U.S. Census Bureau ("Census"), requires the filing of electronic export information ("EEI"), the electronic successor document to the SED, through the AES pursuant to 13 U.S.C. § 305, the EAR, and Title 15, Code of Federal Regulations, Part 30 (the Foreign Trade Regulations ("FTR")).  The purpose of these requirements is to strengthen the United States government's ability to prevent the export of certain items to unauthorized destinations and end-users because the AES aids in targeting, identifying, and when necessary confiscating suspicious or illegal shipments prior to exportation. 15 C.F.R. § 30.1(b).  At all times relevant to the matters alleged herein, an EEI was required to be filed for, among other things, the export of commodities valued over $2,500 per the Harmonized Tariff Schedule of the United States of America ("HTSUSA") commodity classification code or any commodity requiring an export license, and was required to contain, among other information, the names and addresses of the parties to the transaction, and the description, quantity, and value of the items exported.  15 C.F.R. § 30.6(a).

**C.      SMUGGLING GOODS FROM THE UNITED STATES**

20.     Title 18, United States Code, Section 554 provides in pertinent part:

> Whoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States, shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 554(a).

## IV. PROBABLE CAUSE

21.     On August 21, 2019 OEE BIS Special Agents Garrett Greer and Brendan Quinlan, along with Homeland Security Investigations Special Agent Alex Miris went to New England Custom Gun located in Claremont, New Hampshire and spoke with "MC." The purpose of this meeting was to get information on possible export license violations on two (2) separate orders of rifle scopes that had been placed on July 16, 2019 and August 12, 2019 through New England Custom Gun.  MC provided us with both orders that were requested for the following items: one (1) GPOTAC – 1 – 8x24i – GPORT 820 – Horseshoe Reticle (purchase price $1899.99) and one (1) MEOSTAR R2 – 2.5-15x56 RD – 4C Illuminated Reticle – MEO597490 (purchase price $1599.95).  The orders were placed by Restu Sunarto and he requested that the items be shipped to 3340 A Greens Road Suite 700, Room 2269, Houston, Texas 77032.

22.     On August 26, 2019, Special Agent Quinlan requested the assistance of the OEE BIS office in Houston, Texas to make contact with the freight forwarding company located at 3340 A Greens Road Suite 700, Room 2269, Houston, Texas 77032.  Special Agent Paul Mack from the OEE in Houston subsequently went to the location and informed OEE Boston that Suite 700 had three (3) companies located in it.  Agent Mack spoke to a truck driver who was with Genuine Transportation, one of the companies located within Suite 700.  The truck driver provided a business card for the President of the trucking company, "JW." It was stated that JW lives in and operates the business from Canada.  The truck driver further stated that JW and Genuine Transportation has goods shipped to their Houston and Dallas offices, then has the shipments loaded in one of their trucks and the goods are then transported to Canada.

23.     On August 27, 2019, MC from New England Custom Gun sent an email Restu Sunartu (sunarto_restu@hotmail.com) informing him that the scopes would be shipped to the

9

address in Houston that he provided on both of his shipping orders. MC further informed Mr. Sunartu that the items would be shipped from within the United States. MC also stated to Mr. Sunartu that if the items were to be shipped to Canada then they would need an export permit. This last statement by MC was made because of the Canadian phone that Mr. Sunartu provided on both of his orders.

24. Based upon the foregoing, there is probable cause to believe that information obtained from the requested GPS tracker will constitute and lead to evidence, fruits, and instrumentalities of the Subject Offenses. The requested GPS tracker is necessary to enable OEE to track the precise locations and movements of the Target Shipment, so that OEE can effectively determine the final destination of the shipment and identify other businesses and individuals potentially involved in violations of the Subject Offenses and develop evidence of the these offenses.

## V. REQUESTED ORDERS

### A. INSTALLATION AND MONITORING OF TRACKING DEVICE

25. Accordingly, pursuant to Federal Rule of Criminal Procedure 41, 18 U.S.C. § 3117, and 28 U.S.C. § 1651, it is requested that the Court issue a Warrant and Order authorizing the installation of a GPS mobile tracking device in or on the Target Shipment by law enforcement officials in order to monitor the movements and locations of the Target Shipment.

26. It is further requested that the Court authorize technicians, agents of OEE and other U.S. Government agencies, other employees of BIS, and their authorized representatives to monitor the signals from a GPS mobile tracking device installed in or on the Target Shipment for a period of 90 days following installation of the requested GPS tracking device, including signals

produced inside private locations and other places not open to the public or visual surveillance to include locations outside of the United States.

## B. ACCESS TO TARGET SHIPMENT DURING MONITORING PERIOD IF REPAIRS TO GPS TRACKER BECOME NECESSARY

27. Based on my training and experience, GPS tracking devices can require repair or other maintenance during a prescribed monitoring period. If the repair or maintenance becomes required, it will become necessary to access the Target Shipment during the monitoring period solely and exclusively to repair or maintain the GPS tracking device. If agents access the Target Shipment during the monitoring period to repair or maintain the GPS tracking device and see contraband or evidence of other crimes beyond the Subject Offenses, agents will not seize the items without obtaining a further search warrant. The Target Shipment will only be accessed if it is in a place accessible by the public or upon consent of the party then having possession, custody, or control over the Target Shipment. Since this entry into the Target Vehicle will need to be covert, as to not alert the Targets of the investigation, or other co-conspirators, the entry may need to be made at night, between the hours of 10:00 p.m. and 6:00 a.m.

## C. REQUEST FOR SEALING AND DELAYED NOTICE

28. Pursuant to Fed. R. Crim. P. 41(f)(2)(c), (f)(3), and 18 U.S.C. § 3103a, I also request permission to delay service of the warrant on the owner of the Target Shipment for a period of 30 days beyond the end of the disclosure period. Based on my training and experience, and my investigation of this matter, I believe that reasonable cause exists to delay service of the warrant for a period of 30 days beyond the end of the disclosure period, because immediate notification of the warrant is likely to have the adverse result of placing the investigation in serious jeopardy. The investigation is ongoing, and providing immediate notification of the

warrant may cause the targets, and other co-conspirators to change their methods of operation, destroy evidence, flee or otherwise seek to avoid prosecution.

## VI. CONCLUSION

29. Based on the above facts, there is probable cause to believe that information concerning the movements of the Target Shipment will provide evidence of violations of the Subject Offenses. Therefore, I request that the Court issue the requested warrant and order.

/s/ Garrett Greer

Garrett Greer, Special Agent
U.S. Department of Commerce Bureau of
Industry and Security Office of Export
Enforcement

Subscribed to and sworn before me
this 29th day of August, 2019.

Hon. Andrea K. Johnstone
UNITED STATES MAGISTRATE JUDGE